UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: RODNEY GRUBBS,
Debtor.

**CASE NO. 23-05593-JJG-7A**

**JOANNE FRIEDMEYER, TRUSTEE,**
**Plaintiff,**

v.

**SCOTT SIEWERT and TERESA SIEWERT,**
**Defendants.**

**Adversary Proceeding No. 25-50127**

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendants Scott Siewert and Teresa Siewert, proceeding pro se, respectfully submit this Opposition to Plaintiff's Motion for Summary Judgment. For the reasons set forth below, the Motion should be denied in its entirety.

## I. INTRODUCTION

Plaintiff seeks summary judgment avoiding and recovering the December 11, 2023 Transfer as a preferential transfer under 11 U.S.C. § 547. This request should be denied because the record, viewed in Defendants' favor, contains genuine disputes of material fact on multiple elements of Plaintiff's claim and on Defendants' affirmative and equitable defenses.

Defendants preserve their demand for trial by jury on all issues triable by jury. To promote judicial economy, feasibility, and efficient administration of this adversary proceeding, Defendants have separately consented, pursuant to 28 U.S.C. § 157(e), Fed. R. Bankr. P. 9015, and S.D. Ind. B-9015-1, to the Bankruptcy Judge conducting any jury trial in this adversary proceeding. That consent is limited to the forum for conducting any jury trial and does not waive Defendants' rights, defenses, opposition to summary judgment, Rule 56(d) request, evidentiary objections, appellate rights, objections preserved under applicable law, or any right to request reasonable accommodation, remote appearance, or remote testimony if warranted. Defendants expressly preserve all rights under 28 U.S.C. § 157(c), *Stern v. Marshall*, 564 U.S. 462 (2011), and related authority.

## II. STATEMENT OF MATERIAL FACTS IN DISPUTE

Defendants identify the following material facts that, viewed in Defendants' favor as nonmovants, preclude summary judgment. Defendants do not contend that every fact alone defeats Plaintiff's Motion. Rather, the combined record creates genuine disputes concerning the nature and purpose of the Transfer, whether the Transfer was solely on account of antecedent debt, whether the Transfer involved property of the Debtor and diminished the estate, whether Defendants provided contemporaneous new value, the value of those services at the time of the Transfer, Debtor credibility, and whether recovery under § 550 would benefit the estate.

1

**A. The Original Transaction and the Debtor's Representations Are Material to Credibility, Source of Funds, and Context of the Transfer at Issue**

1. Defendants admit that they wired $25,000.00 in March 2019 in connection with a promissory note executed by the Debtor. Defendants dispute Plaintiff's characterization of both the original transaction and the December 11, 2023 Transfer as a simple ordinary note repayment.

2. The Debtor represented to Defendants that the $25,000.00 was being solicited for a legitimate Pickleball Rocks / All About Pickleball business purpose, including apparel inventory related to Debtor's Midwest Sports opportunity. Defendants contend that they relied on those representations. [Exh. A, Promissory Note; Exh. B, Debtor solicitation email; Exh. C, Debtor thank-you letter]

3. Bank records show that Defendants' $25,000.00 was deposited into FCN account ending 3463, associated with New Level Financial Group LLC, rather than into an All About Pickleball or Pickleball Rocks operating account. Plaintiff admits in the pleading that New Level Financial Group LLC was administratively dissolved before the transaction. Account activity shows commingling and rapid use of funds for purposes other than the represented inventory purpose. [Exh. D, x3463 March 2019 statement; Exh. E, Limited Tracing Analysis of Funds Used for Transfer and Flow of Funds x4071/3463/1322/7979]

4. These facts are not offered to ask the Court to decide an independent fraud claim in this adversary proceeding. They are offered because Plaintiff's Motion relies heavily on the Debtor's present characterization of the transaction, accounts, source of funds, and purpose of payment. The original representations, account routing, commingling, and use of funds are material to Debtor credibility, tracing, source and purpose of funds, and whether the December 2023 Transfer can be treated as a simple antecedent-debt repayment as a matter of law.

**B. The December 2023 Timeline Supports a Genuine Dispute Concerning Purpose, Intent, and Allocation**

5. The Debtor did not repay Defendants when the Note matured on September 23, 2020, as requested by Defendants on August 8, 2020, and made no payment for more than three years despite Defendants' repeated requests and efforts to resolve the debt. [Exh. F, Debtor/Defendant communications; Exh. G, Teresa Siewert Declaration; Exh. H, Scott Siewert Declaration]

6. On December 1, 2023, Defendants' then-counsel, Taren Delisle, sent the Debtor a demand and settlement communication offering to resolve the matter for $30,000.00. [Exh. I, December 1, 2023 Delisle demand/settlement letter]

7. On December 2, 2023, the Debtor responded that there was "simply no way" he could make the requested payoff that week, offered only a future possible partial payment, and stated that when he made a final payoff, he would cover the attorney fees because he had caused them. [Exh. J, December 2, 2023 Debtor email]

8. The $30,000.00 settlement opportunity expired without payment. [Exh. G; Exh. H.]

9. On or about December 9, 2023, Defendants publicly posted their experience with the Debtor. [Exh. K, December 9, 2023 social-media post]

10. After the public post, the Debtor initiated communications with attorney Delisle concerning the public postings, investor/lender reaction, removal or mitigation of negative posts, and a public update. [Exh. L, Plaintiff's discovery production of Debtor–Delisle text communications]

2

11. The Debtor-Delisle communications show that the Debtor first offered delay or partial payment, including a proposed $20,000.00 payment to be made on December 14, 2023. As the post spread and the Debtor reported increasing investor/lender pressure, the Debtor escalated to a higher payment to resolve the public-facing dispute. [Exh. L.]

12. Attorney Delisle advised the Debtor that once a payment was tendered and cleared, she would assist in drafting and publishing a retraction or update stating that the loan was paid in part or in full. She also advised that payment, resolution, and a thoughtful update would be an effective remedy. The Debtor responded, "Agreed." [Exh. L.]

13. On December 11, 2023, the Debtor wired $56,638.91 to attorney Delisle's IOTA trust account. In an accompanying email, he stated that he had calculated an amount he represented would cover the defaulted loan as part of a settlement of the then-current dispute. The payment was not made directly to Defendants and was not the $30,000.00 settlement amount that Defendants' attorney had offered eight days before the public post. [Exh. M, Debtor wire/payment email]

14. The Debtor's own contemporaneous texts connected the payment to public-facing relief. The Debtor stated that the post was pushing him toward bankruptcy, that pickleball lenders would not be paid, that he had been working on the payment while fighting fires caused by the posts, that he wired full payoff, and that counsel should "Please have them stop the posting." [Exh. L.]

15. After the Transfer, attorney Delisle informed the Debtor that Defendants were working on a factual update stating payment in full was made. The Debtor continued requesting that the update be visible, that negative posts be taken down, and that the post "go away." [Exh. L.]

16. Defendants contend that they updated the original post to state that the Note had been paid in full, removed the original post, and did not repost the content or contribute to its further dissemination after the resolution process, all consistent with their counsel's instructions. These actions were verified by Defendants' counsel and by the Debtor in the Debtor–Delisle text communications. The actions were also verified in an independent email and declaration from a creditor of the Debtor and in Facebook metadata received by Defendants concerning the updated post. [Exh. G; Exh. H; Exh. L; Exh. N, Facebook metadata; Exh. O, Griffith email; Exh. P, Griffith Declaration]

17. The Debtor also requested removal of a second post by Defendant Scott Siewert on a separate social-media site concerning a default judgment against the Debtor. That post was also removed by Defendants, as attorney Delisle confirmed in a text communication to the Debtor. [Exh. L] **Defendants attest herein under penalty of perjury that these requested actions were part of an exchange that was undertaken contemporaneously with the Transfer and made contingent prior to disbursement to Defendants' of the funds on December 18, 2024.** [Exh.TT Attorney Disbursement – Closing Statement]

18. These facts support a reasonable inference that the Transfer was not solely a routine payment of antecedent debt, but a mixed-purpose, attorney-negotiated exchange involving payment, public-facing services, reputational relief, removal or mitigation of negative posts, and agreement not to repost the original content. **At minimum, the purpose, intent, value, timing, and allocation of the Transfer are disputed factual issues.**

**C. Plaintiff's Original Complaint, Same-Day Amendment, and the Debtor's Communications Create Credibility and Intent Disputes**

19. Plaintiff's original Complaint alleged: "Prior to making the Transfer, Debtor requested that Defendants remove negative social media posts about him in exchange for payment of the Note via the Transfer." [Exh. Q, Original Complaint ¶ 21; Case No. 23-05593-JJG-7A, Doc. 538]

3

20. In text communications produced in discovery by Plaintiff's counsel, the Debtor wrote to attorney Mulvey after reviewing the original filed Complaint that "nowhere in the documented" conversations did he request removal of the posts in exchange for payment and that he "never requested they stop." Plaintiff's counsel responded that he was "going to amend." Plaintiff filed an Amended Complaint later the same day, deleting the allegation in paragraph 21. [Exh. R, Plaintiff's discovery production of the Debtor's text to Plaintiff's counsel and counsel's response concerning amendment; see also Amended Complaint, Adv. Proc. No. 25-50127, Docs. 3 and 9]

21. The Debtor's denial is contradicted, or at minimum materially disputed, by the Debtor-Delisle communications provided in discovery. The Debtor asked that the posting stop, asked whether negative posts would be taken down, complained that posts were spreading, and later asked counsel to make the post "go away." [Exh. L.]

22. The Debtor sent Plaintiff's counsel an email denying that "documentation" existed showing that he had requested post removal, despite the contrary evidence. Attorney Mulvey responded that he would remove the allegation concerning the Debtor's "exchange" for removal of the post, and Plaintiff amended the pleading accordingly.

Plaintiff relied on the Debtor's statement; yet, when the Debtor later supplied texts confirming documented and repeated requests to remove the post, Plaintiff did not acknowledge the contradiction. **These disputed and genuine facts are material to the Debtor's credibility, the parties' intent at the time of the Transfer, Defendants' contemporaneous-new-value defense under § 547(c)(1), the value of the public-facing services when rendered, and the proper allocation of the Transfer.**

**D. Plaintiff's Text Production Appears Incomplete and Supports Additional Discovery to Ensure a Complete Factual Record**

23. Plaintiff's text-message production appears incomplete as to the beginning and full context of the Debtor–Delisle negotiation. The produced screenshots do not show an initial introductory communication from the Debtor to attorney Delisle. Instead, the earliest produced messages appear to begin midstream and presuppose prior communications regarding the public posts, investor/lender reaction, payment, payoff timing, and attorney involvement. [Exh. L.]

24. Defendants understand, based on information available to them, that the Debtor initially contacted Defendants' former attorney, Taren Delisle, by telephone on December 9, 2023, concerning the public posts and their removal or mitigation. The screenshots produced in discovery lack complete date-and-time information, include overlapping images, and contain portions of messages that are obscured or cut off. [Exh. L]

25. These issues support Defendants' request for relief under Rule 56(d) and for additional discovery concerning the complete Debtor–Delisle communications, native text records or metadata, testimony from the Debtor and attorney Delisle, and any evidence concerning the initial telephone contact. These facts are essential to opposing Plaintiff's assertions concerning antecedent debt, contemporaneous exchange, value, intent, and the Debtor's credibility.

26. Plaintiff's production of the Debtor's communications also raises material completeness concerns supporting Rule 56(d) relief. Defendants identified at least one relevant communication between the Debtor, Plaintiff's counsel, and the Trustee that was not included in Plaintiff's production until Defendants specifically requested it after finding a reference to it in a text communication to Plaintiff's counsel. Plaintiff's counsel characterized the omission as an "oversight." [Exh. R Debtor Text to Plaintiff's Counsel re: Denial and Amendment and Response]

27. The November 4, 2025 email is material because, in it, the Debtor communicated directly with Plaintiff's counsel concerning potential claims against Defendant Teri Siewert and attorney Matthew Foster; stated that he did not want to jeopardize any action Plaintiff might be planning against Teri Siewert; accused Defendants and Foster of misconduct; and framed potential litigation as financially beneficial to creditors. [Exh. S Nov. 4, 2025 Debtor email to Plaintiff's counsel]

28. The omission is significant because Plaintiff's Motion relies heavily on the Debtor's affidavit and his current characterization of disputed events. The missing email bears on the Debtor's bias and motive, his communications with Plaintiff's counsel, Plaintiff's reliance on the Debtor, and the adversarial context in which he communicated about Defendants. Defendants are reviewing additional communications between the Debtor, Plaintiff, and Plaintiff's counsel that raise questions requiring further discovery concerning the Debtor's role in advocating litigation against Defendants and the timing of the Complaint which was filed months after all other adversary proceedings and near the limitations deadline. Defendants are preparing deposition questions concerning those communications now that they have received the subpoenas via remote means due to a recent Court order allowing that process.

Debtor's November 4, 2025 email is of particular concern because its timing and content support a reasonable inference that it may have influenced the decision or timing of Plaintiff's Complaint. Defendants do not allege bad faith based on the current record. Defendants do assert that the acknowledged omission of a relevant Debtor communication, combined with the apparent incompleteness of the Debtor–Delisle screenshots, demonstrates that further discovery is necessary before summary judgment may be fairly decided.

Defendants need time to obtain the complete communications among the Debtor, Plaintiff, Plaintiff's counsel, and attorney Delisle concerning the Transfer, the original and Amended Complaints, and the Debtor's affidavit; to depose the Debtor concerning his affidavit and previously filed answers; and to obtain additional witness declarations concerning the Debtor's written or oral allegations against Defendants, including allegations of defamation (goes to bias, motive, intent and credibility). Defendants also need native text exports, metadata, attachments, forwarding history, records of Plaintiff's certified public accountant concerning the Transfer and the Debtor's accounting practices, and declarations or testimony identifying who selected, transmitted, and produced the screenshots included in Plaintiff's discovery production. Defendants have obtained subpoena forms for the Rule 2004 examination materials and the Debtor's deposition and are preparing subpoenas for Matt Foster and Kevin Kern to testify as to Defendants' roles in support of their asserted affirmative and equitable defenses. Defendants are also preparing a targeted second set of interrogatories because Plaintiff's earlier responses stated that Plaintiff lacked information that has been made available through subsequent discovery.

### E. The Debtor's Own Statements Show the Value of the Exchange at the Time of the Transfer

29. Plaintiff argues that Defendants provided no value because the involuntary bankruptcy followed days later. Defendants dispute that hindsight-based framing. Defendants' actions had significant value at the time. The Debtor had operated his business for approximately twenty years by cultivating the faith and trust of hundreds of people who had reason to accept his reframed account of events.

**The Debtor's own contemporaneous communications show that he believed the public-facing services had important economic and operational value when rendered. He described the posts as causing investor/lender pressure, negative calls, business harm, risk of bankruptcy, and damage to Pickleball Rocks. He continued to demand more visible updates and ultimately requested full removal of the post because he**

**considered those actions imperative to stemming the tide of public opinion and attempting to reverse the posts' effects. [Exh. L]**

a. The Debtor described the social-media exposure as causing a "run on the bank" from personal lenders calling notes due, and a witness reported the Debtor's statement that he paid to quiet and stop the public exposure. [Exh. T, Pasela email; Exh. U, Pasela Declaration]

b. In a telephone call concerning Defendants' post and the resulting concern, creditor Jackie Vohs declared under penalty of perjury that the Debtor told her directly that he paid Defendants to "hush them up" and that "95% of pickleball players will never know this happened." This witness has also agreed to testify. Vohs's testimony bears on both the "exchange" and "value" disputes and is an important part of Defendants' affirmative defense, which requires live testimony before a jury rather than resolution on summary judgment. [Exh. V, Vohs Declaration concerning the Debtor's statements about the Transfer]

c. In a January 2, 2024 communication to Marian and Guy Pasela, the Debtor described a social-media "firestorm," investor calls, empty bank accounts, and halted payments. [Exh. W, Pasela email; Exh. X, Pasela Declaration]

d. On December 13, 2023 in an email to creditor Rick Griffith, Debtor wrote: "The very short story, that has two pieces to it, is that one of my long time pickleball investors (Scott and Teri Siewart) decided to make public on Facebook that I didn't pay them on time so they wanted to "warn" others. This went viral on Facebook very quickly and set off a storm of my current investors wanting to call their notes due. The heck of it is, I worked with them to get them fully paid off after a very rough trip through the pandemic. Then they unleashed this on me. At the very same time, one of my long time real estate investors filed a judgement against me which then went on the public court records, and the same pickleball investor (Siewarts) also made that public on Facebook. The figures in that judgement were greatly inflated and would have been eventually settled peacefully with real estate. But with the pickleball investor (Scott and Teri) making it public, it has created the perfect storm with every investor wanting to cash out now." [Exh. O]

This email contains several statements by the Debtor that are relevant to the factual disputes in this proceeding and to the Debtor's credibility:

1. The Debtor admitted harm to his business and the value that Defendants' mitigation services had for him at the time of the Transfer;
2. The Debtor's assertion that he had worked with Defendants concerning payment after the pandemic bears on credibility because he had refused multiple efforts by Defendants throughout 2023 to negotiate resolutions, including offers to forgo interest, establish a payment schedule, and settle for nearly half the amount owed;
3. The Debtor characterized the judgment in the Masterson case as "inflated" and unrelated to the pickleball investments, although the judgment is documented in the court record;
4. After the post appeared, creditor Rick Griffith expressed concern about his personal investment, writing that he had a "sickening feeling" when he saw Defendants' post. The Debtor responded, "Let me quickly quiet your mind." He then characterized Defendants' social-media post as a "very serious defaming post" and stated that "most of their post was false or misleading information." He also stated that he was "trying to get the situation with the Siewerts resolved as quickly as possible." The Debtor

6

referenced "full payoff," stated that Defendants would be posting a factual update and removing negative posts—which he believed "has already occurred"—and warned that "the worst thing that could happen to us right now is everyone decides to pull out at the same time"; and

5. **The Debtor further stated in the Griffith email that Defendants were "very upset that I chose to cash out a couple other investors ahead of them" and that, "Right or wrong, I did it because those families had more pressing emergency needs."** This is another alleged misrepresentation bearing on credibility because the bankruptcy record reflects that the Debtor paid hundreds of thousands of dollars to substantially more than two creditors during that period.

These statements by the Debtor bear not only on the factual disputes concerning the exchange, but also on the Debtor's credibility.

30. The Debtor further demonstrated in his own writings his belief in the value of a favorable reputation. In soliciting potential investors and assuring them of the safety of an investment, he wrote: "Plus they know that if we didn't follow through on our financial promises to them, one simple negative post could ruin us." [Exh. Y, Debtor's All About Pickleball/Pickleball Rocks marketing document]

The Debtor used this same quotation multiple times in solicitation emails to potential and actual investors. Defendants are seeking additional witness declarations from the Debtor's creditors concerning those solicitations. This evidence further supports Defendants' request for Rule 56(d) relief and adherence to the discovery period established by the Court at the pretrial conference.

31. The Debtor also made statements in a public online legal forum called JustAnswer. Defendants personally viewed the postings online, obtained the screenshots submitted here, and attest under penalty of perjury that the screenshots are true and correct copies of what they viewed. [Exh. Z JustAnswer Screenshots / Debtor Statements]

In these communications, the Debtor identifies the case as No. 23-05593-JJG-7A, refers to Defendant Teresa Siewert by her commonly used name, Teri, and addresses the following: the Debtor's own characterization of the circumstances surrounding the Transfer; the Debtor's admissions regarding reputational concerns, investor confidence, and operational pressures; the Debtor's acknowledgment that public exposure triggered lender panic and operational collapse; and the existence of disputed factual issues concerning the purpose and nature of the Transfer.

The Debtor's statements include the following:

1. The Debtor wrote: "My case is 23-05593 in the Southern District of Indiana. I checked PACER yesterday and in the. Southern District of Indiana there have been 16,535 voluntary chapter 7 bankruptcies filed in the last 36 months. There has been ONE (1) Involuntary Chapter 7 filed....mine. Here is the background. In 2019 I borrowed $25K from a friend, Teri, with a promissory note showing I would pay her back with interest in September 2020. Being smack dab in the middle of the pandemic, my business was floundering and I was borrowing more money to keep it growing. I explained to Teri that I would pay her back when I could. On December 7, 2023, Teri came into my store and yelled at my wife and me that I should file bankruptcy and quit borrowing money from people. I had recently,

7

through her attorney, told her I would have her paid back fully by the end of the year (2023). My clothing business had done $350K in 2023 so I was finally ready and able to pay her. She left my store claiming that I would pay for me not taking care of her when she wanted her money back, and that I would never hurt anyone again."

**Relevance:** The statement presents a direct credibility dispute. Defendant Teresa Siewert has never been in Indiana or in the Debtor's Indiana store and has never yelled at the Debtor or his wife. Teresa Siewert did tell the Debtor, at a tournament in Holly Hill, Florida, on December 5, 2023, that he should file bankruptcy rather than continue taking money from people if he could not repay them. She did not threaten the Debtor. Defendants were in White Springs and High Springs, Florida, on December 7, 2023, and can provide corroborating evidence at trial. Defendant Teresa Siewert attests herein to these facts under penalty of perjury.

2. The Debtor admits that public exposure allegedly triggered lender panic and operational collapse, *"On December 11, she went on social media telling everyone I was a fraud and running a ponzi scheme. This went viral quickly and there was immediately a run on the bank from all my personal lenders calling in their notes, whether I was past due or not."*

   **Relevance:** This statement supports Defendants' contention that investor confidence, reputational concerns, and operational stability were central to the Debtor's actions and motivations surrounding the Transfer; that those concerns prompted the exchange related to the Transfer; and that the Debtor's ongoing operations depended heavily on continued lender and investor confidence.

3. The Debtor admits that he made the payment in response to the escalating public controversy. *"On December 12th I wired full payment to Teri's attorney, with the hope she would be happy."*

   **Relevance:** This statement supports Defendants' contention that the Transfer involved reputational and operational motivations beyond simple repayment of antecedent debt.

4. The Debtor admits that the bankruptcy filing followed Defendants' creditor-coordination efforts. *"6 days later, Teri apparently had contacted Indianapolis attorney, Matthew W. Foster. She helped him find a few of my friends/lenders and they filed the Involuntary Chapter 7 against me on December 17, 2023."*

   **Relevance:** This statement supports Defendants' position that their post-transfer efforts contributed to creditor coordination and initiation of the involuntary bankruptcy proceeding, which Defendants contend supports their new-value defenses.

5. The Debtor acknowledges the long-term investor/lender structure. *"I filed schedules showing just over $47M owed to over 275 creditors." "The bulk of that $47M was accrued interest from friends who had loaned me money for real estate investment 15-20 years ago..."*

   **Relevance:** These statements support Defendants' contention concerning the operational structure of the investment program and its reliance on continuing lender funding.

8

6. The Debtor admits that public allegations affected business operations. *"These allegations are all false, but everyone believes the news and social media so my hands have been tied."*

   **Relevance:** This statement supports Defendants' contention that public perception and investor/lender confidence materially affected the Debtor's operations and financial position. It also bears on credibility because the Debtor continues to blame Defendants for his business failure rather than accept responsibility for his own actions.

7. The Debtor acknowledges his desire to clear his name in the adversary proceedings

   *"I just want to come out of this without the words Fraud and Ponzi Scheme attached to me. That is what I hope to accomplish in the Adversary Proceedings."*

   **Relevance:** Relevant to the Debtor's motives, credibility, reputational concerns, and litigation posture.

8. The Debtor expresses a desire to help the "friends" to whom he owes money while making allegedly false claims about Defendants and revealing his bias against them

   *"But I would like to help my friends get some of their money back that they faithfully loaned to me over the 20 year time span. The attorney (Foster) admits he had never done an involuntary bankruptcy and he hadn't even practiced bankruptcy for almost 10 years. So my question is, would I have grounds for finding the right civil law attorney and filing a $47M legal negligence suit against the attorney who filed this involuntary chapter 7 against me, and a $5M defamation suit against the lady (Teri) who has run the media smear campaign and ruined my life and the lives of those who will never see their investments returned?"*

   **Relevance:** Relevant to the Debtor's motives, credibility, reputational concerns, and litigation posture.

   **These statements present contradictory and allegedly false narratives bearing directly on the Debtor's credibility. Because Plaintiff relies on the Debtor's affidavit in support of the Motion, these disputes are matters for the factfinder to evaluate through live testimony.**

## F. Plaintiff's Argument That Later Developments Eliminated Any Value Has No Merit

32. The Debtor negotiated for removal of the post, a "paid in full" resolution, an agreement not to repost the original content, and removal of a second post concerning a default judgment. Defendants performed those requested acts contemporaneously with the Transfer. Thus, the Debtor received the precise consideration he requested when he made the payment: an exchange for services that Defendants contend had value to him and his business and constituted contemporaneous new value. These facts create genuine **disputes concerning the update, removal or mitigation, non-reposting, monetary value of the exchange, and the money's-**

9

worth value of the reputational-repair services to the Debtor at the time of the Transfer. Those disputes are properly resolved by the factfinder at trial.

## G. The Amount Paid Creates an Allocation Dispute

33. Defendants contend that the amount owed under Indiana contract law governing the Note as of December 11, 2023 was approximately $49,140.36, not $56,638.91. [Exh. AA, Note calculation under Indiana contract law]

34. The Debtor paid approximately $7,498.55 more than was owed under the terms of the Note and approximately $26,638.91 more than the expired $30,000.00 settlement amount Defendants had recently offered to accept just 10 days prior.

35. Defendants did not demand $56,638.91 during the December 2023 negotiations and did not provide the Debtor with a payoff figure other than the prior $30,000.00 settlement offer. The Debtor calculated the amount himself. According to his text messages, JustAnswer communications, and telephone conversation with Ms. Vohs, he paid an amount exceeding the asserted Note balance to obtain the requested mitigation actions from Defendants. [Exh. F; Exh. I; Exh. J; Exh. M]

36. **The amount paid, the attorney-trust structure, the later disbursement only after requested public-facing actions, and the difference between the Note calculation, the settlement offer, and the Transfer amount create factual disputes concerning allocation, attorney-fee components, contemporaneous value, and whether Plaintiff can avoid and recover the full amount of the Transfer.**

## H. Source of Funds, Debtor Property, Control, and Diminution Are Disputed

37. The December 2023 statement for account ending 4071 shows that the account balance had dropped to approximately $2,169.75 on December 4, 2023 before the deposits that preceded the Transfer. [Exh. BB, FCN Account x4071- December 2023 statement]

38. The same statement shows a $70,000.00 deposit from S&T Enterprises LLC on or about December 5, 2023 and a $25,000.00 deposit from James and Karen Freeman on or about December 11, 2023. Defendants contend those deposits are material because they appear to be the funds that enabled the Transfer at issue. [Exh. CC Forensic Accounting Summary -Dec. 2023 x4071]

**Defendants dispute that the deposits were the Debtor's operating funds and assert that the funds were solicited for the express purpose of replacing Defendants' "slot" in the Debtor's investment-replacement enterprise.**

39. Plaintiff alleges that these deposits were simply funds deposited into the Debtor's accounts and relies on the Debtor's affidavit to contend that they were operating funds used and controlled by the Debtor. Plaintiff has not provided declarations, affidavits, or testimony from S&T Enterprises LLC, Mike Stoddard, James Freeman, Karen Freeman, or any other depositor establishing the purpose, restrictions, or intended use of those deposits.

40. The Debtor's filed answers in related adversary proceedings describe a rolling investor/lender model involving investor "slots," note renewals, replacement lenders, investor cash-outs, and use of new lender funds or business proceeds to pay prior investors. The Debtor told new investors that their funds would replace prior investors and used well-known pickleball personalities, including Jack Thomas, a former USAPA president, to establish credibility and solicit funds. [Exh. DD, Debtor Answer in AP No. 25-50097;  Exh. EE, Hooker and Lew emails; Exh. FF, Hooker Declaration; Exh. G]

41. Plaintiff relies on the Debtor's affidavit and limited bank statements to state a claim for avoidance and recovery. **Defendants dispute Plaintiff's characterization and contend that a forensic analysis of the Debtor's bank records presents a materially different picture.** The 3463 and 4071 accounts were commingled with two other FCN accounts ending in 1322 and 7979, with transfers moving among all four accounts. [Exh. GG, Sample November 2023 bank statements for x4071, x3463, x1322, and x7979]

Defendants' records show deposits and transfers moving rapidly into and out of accounts 4071 and 3463. This activity supports the disputed nature of the Transfer and the replacement issue because the Debtor used the funds primarily to make interest payments to prior investors and replace prior investors' "slots." [Exh. HH, Limited Tracing Analysis - Flow of Funds (multiple accounts)]

**Defendants dispute that the funds were provided to the Debtor merely in exchange for promissory notes.** They contend instead that the funds were provided to replace Defendants' "slot" and that the Debtor acted as a conduit for those funds, as he had done for years with other investors. The vast majority of investor/creditor funds were not generated from Pickleball Rocks operating income but came from other investors and creditors participating in the Debtor's rolling investment model.

Defendants dispute that the estate was diminished by the Transfer because Defendants' single investment position was replaced by at least two other investors. The estate received $95,000.00 in new deposits, producing a net increase of $38,361.09 after the Transfer.

**Defendants do not ask the Court to find on summary judgment that earmarking, conduit status, or lack of diminution is conclusively established. They contend that the bank records, timing of deposits, the Debtor's replacement-lender model, absence of depositor testimony, and credibility issues create genuine factual disputes concerning source, purpose, tracing, dominion and control, whether the Transfer involved an interest of the Debtor in property, and whether the estate was diminished.**

### I. Defendants' Post-Transfer Conduct Is Relevant to Subsequent New Value, Estate Benefit, and § 550

42. After the Transfer, Defendants helped identify creditors, gather claim information, connect creditors across multiple states, contact attorney Matt Foster, and assist with creditor organization that primarily and materially led to the December 2023 creditor meeting and involuntary bankruptcy petition. [Exh. II, Foster emails – Creditor Organization; Exh. JJ, Zoom Creditor Meeting Organization]

43. Defendants also provided information to assist investigators that Defendants contend contributed to the January 12, 2024 Cease and Desist Order, a regulatory action that helped stop further investor solicitation, dilution of the creditor pool, and asset dissipation. [Exh. KK, Kern thank-you email; Exh. LL, Cease and Desist Order – Jan. 12, 2024; Exh. G; Exh. H.]

**Defendants dispute Plaintiff's denial that Defendants' subsequent services had value. Taken as a whole, Defendants' actions had value, and the monetary value of those services is properly determined by the factfinder at trial. Defendants provided uncompensated services benefiting the estate both before and after the petition, including investigative and forensic work, victim coordination and case development, regulatory and legal assistance, and media and fraud-prevention outreach.** [Exh. MM, Quantification of Services to the Benefit of the Estate]

44. All seven lead petitioners and other creditors have provided declarations attesting to Defendants' role in organizing creditors, preserving information, and assisting the estate or creditor body.

[Exh. NN, Declarations of Lead Petitioners & Creditors (in Support of Defendants and Settlement for the Benefit of the Estate): (1) Supp. Decl. Woodsum; (2) Supp. Decl. Butler; (3) Decl. Hilligoss; (4) Supp. Decl. Coats; (5) Decl. Handy; (6) Decl. Lew; (7) Decl. Evans; (8) Decl. Ponder; (9) Decl. Gilmore; (10) Supp. Decl. Pasela]

## J. Economic Considerations and Practical Benefit to the Estate

### Cost-Risk Analysis, Practical Recoverability, and Assignment of Any Judgment to Third-Party Debt Buyers

**45. Given Plaintiff's admission in response to Interrogatory No. 13 that the amount of the Transfer is less than the expected costs of litigation necessary to recover it, litigation in this proceeding may harm rather than benefit the estate.** Multiple lead petitioners and other creditors have stated through declarations that they would like the Court to consider the economic realities of this proceeding and its likely net deficit to the estate. [Exh. OO, Plaintiff's Interrogatory Response No. 13]

46. Defendants are elderly, long-standing Florida residents with fixed retirement income. Their current residence at 580 Bermudez Court, The Villages, Florida, has been their permanent homestead since June 2024. Their sole sources of income are Social Security and qualified retirement distributions. Defendants own no material nonexempt real property, brokerage accounts, business assets, or other readily executable property from which a judgment could reasonably be collected. [Exh. PP, Supplemental Declaration of Scott Siewert and Teresa Siewert and Supporting Documents]

47. In February 2026, Eric Lanigan, an experienced Florida bankruptcy attorney, was consulted and retained solely for early settlement negotiations. After reviewing Defendants' finances and assets, including their homestead and retirement accounts, Attorney Lanigan concluded that Defendants were effectively nonrecoverable under Florida law. He communicated this analysis and the governing Florida statutes to Plaintiff and Plaintiff's counsel. His independent assessment provides additional corroboration for Defendants' position. [Exh. QQ, Florida Statutes concerning Judgment Protections; Exh. RR, Declaration of Eric A. Lanigan, Esq.]

48. Even if a judgment were entered, Defendants contend that practical recovery would be negligible. Judgments against elderly, retired Florida residents with fully exempt homestead and retirement assets may be sold to third-party debt buyers at steep discounts of approximately 0.5 to 2 cents on the dollar, and sometimes less. On a face amount of approximately $57,000.00, estimated offers would range from roughly $285.00 to $1,140.00, with some buyers declining entirely. [Exh. SS, Analysis of Practical Collectibility and Third-Party Judgment Sales]

49. Despite their asserted nonrecoverable status, Defendants have made good-faith settlement offers in an effort to resolve the matter, avoid further litigation costs, and permit creditors to receive whatever relief may be available. Plaintiff has declined mediation and the settlement offers. Defendants contend that these economic realities weigh against granting summary judgment and support deferral under Rule 56(d).

## K. Section 502(d) Is Premature

50. Defendants have not filed a proof of claim in the bankruptcy case. Plaintiff's request to bar Defendants from asserting any claim under § 502(d) is premature or unnecessary unless Plaintiff

12

first establishes avoidability and recoverability. Defendants reserve all rights concerning any future claim allowed by law.

## III. LEGAL ARGUMENTS

### A. The Transfer Was Made as a Contemporaneous Exchange for New Value

Plaintiff characterizes the Transfer as a simple repayment of antecedent debt. The evidence demonstrates, however, that the Transfer was made as part of a negotiated resolution of a dispute arising from negative social media posts and was intended by the parties as a contemporaneous exchange for new value under 11 U.S.C. § 547(c)(1).

On December 1, 2023, Defendants offered to resolve the entire obligation for $30,000.00. Only ten days later, on December 11, 2023, the Debtor caused $56,638.91 to be transferred—an amount substantially higher than the settlement offer. The increased payment followed direct negotiations in which the Debtor specifically requested removal or mitigation of negative social-media posts, a "paid in full" update, and an agreement not to repost the dispute. The communications show an escalating public-facing crisis as investor pressure increased. Defendants contend that the Transfer was therefore not made solely on account of antecedent debt, but also to end the public dispute and obtain reputational-repair services that the Debtor believed had substantial value in restoring his image and the confidence of existing and prospective investors at the time of the Transfer.

Significantly, in early communications with his own counsel, the Debtor acknowledged the exchange nature of the transaction. Plaintiff's original Complaint alleged that "Prior to making the Transfer, Debtor requested that Defendants remove negative social media posts about Debtor in exchange for Debtor's payment of the Note via the Transfer."

The Debtor now denies that he requested removal of the posts in exchange for payment. This denial directly contradicts both his contemporaneous text messages with attorney Delisle and Plaintiff's original pleading. The Debtor's shifting position creates a material credibility issue that cannot be resolved on summary judgment.

The important matter to discern under § 547(c)(1) is whether the debtor and the creditor intended the transfer to be a substantially contemporaneous exchange for new value. See In re Gateway Pacific Corp., 153 F.3d 915, 918 (8th Cir. 1998) ("The critical inquiry… is whether the parties intended such an exchange… The existence of contemporaneous intent is a question of fact."); In re Lewellyn & Co., Inc., 929 F.2d 424, 428 (8th Cir. 1991) ("The critical inquiry… is whether the parties intended such an exchange.").

Because genuine disputes of material fact exist concerning the parties' intent, the nature of the Transfer, and allocation of the proceeds—and because resolution of those disputes depends on credibility determinations—Plaintiff's Motion for Summary Judgment should be denied.

### B. Plaintiff Cannot Establish That the Transfer Involved "An Interest of the Debtor in Property" or Diminished the Estate

Under 11 U.S.C. § 547(b), a transfer is avoidable only if it involves "an interest of the debtor in property." The Supreme Court has held that funds the debtor holds for the benefit of another are not "property of the debtor." Begier v. IRS, 496 U.S. 53, 58–59 (1990).

The Seventh Circuit recognizes the earmarking doctrine. In Mann v. LSQ Funding Grp., L.C., 71 F.4th 640 (7th Cir. 2023), the court affirmed summary judgment for the defendant in a case arising from a fraudulent investment/factoring scheme. The court held that when new funds from a third

13

party simply replace funds owed to an existing creditor and the debtor acts merely as a conduit, the transfer does not involve "an interest of the debtor in property" and does not diminish the estate. See also *In re Smith*, 966 F.2d 1527, 1533 (7th Cir. 1992) ("In such circumstances the payment is 'earmarked' and the third party simply substitutes itself for the original creditor. Such a transfer is said not to be a preferential transfer because (1) the debtor never exercises 'control' over the new funds; and (2) the debtor's property … is not diminished.").

This case involves substantial evidence of commingled investor deposits, rapid movement of funds among accounts, and payments to selected creditors from newly deposited investor funds. The December 2023 FCN Bank records show significant investor/lender deposits shortly before the Transfer, including approximately $70,000.00 deposited by investor Mike Stoddard of S&T Enterprises on or about December 5, 2023, and $25,000.00 deposited on or about December 11, 2023—funds that Defendants contend were used to make the Transfer.

The Debtor's own marketing materials and communications describe a replacement-lender model in which new investors replace maturing investors. Plaintiff has acknowledged that the funds used for the Transfer "all arose from payments made by various creditors in exchange for promissory notes." A reasonable factfinder could conclude that the funds used for the Transfer were newly deposited investor/lender funds used to replace prior investor positions, and that the estate was not diminished in the manner Plaintiff claims. Whether the funds were specifically earmarked for Defendants' replacement position presents a genuine dispute of material fact that cannot be resolved on summary judgment.

In *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999), the Supreme Court held that summary judgment was improper where the evidence was susceptible to competing inferences. That principle applies here, where the Court need not decide Defendants' defenses conclusively to recognize that the factual disputes are suitable for a factfinder.

## C. Plaintiff's Reliance on the Self-Serving Affidavit of Rodney Grubbs Is Insufficient for Summary Judgment

Plaintiff's Motion relies heavily on the Affidavit of Rodney Grubbs. That affidavit is self-serving and comes from the architect of the investment scheme. It is directly contradicted by the contemporaneous FCN Bank records showing substantial new investor funds flowing into the accounts immediately before the Transfer.

The Debtor has a motive to support the Trustee's case because he has blamed Defendants for bringing his business practices to public attention and for the resulting collapse of his business. His credibility is further placed in issue by the approximately eight-hour Rule 2004 examination conducted by Department of Justice attorneys, after which the Debtor signed a waiver of discharge. [See Case No. 23-05593-JJG-7A.] Defendants are attempting to obtain the examination transcript to review the Debtor's testimony. The Debtor admitted in his filed answer in Adv. Proc. No. 25-50097 that the Transfer at issue was discussed during that examination.

Courts should view with skepticism the testimony of a fraudulent scheme operator when it is offered to support avoidance of transfers to victims, especially when it conflicts with objective bank records. See *In re M&L Business Machine Co.*, 84 F.3d 1330, 1339–40 (10th Cir. 1996).

Credibility issues are for the jury to determine in live testimony at trial.

14

**D. Defendants Provided Substantial Subsequent New Value and Acted in Good Faith**

Under 11 U.S.C. § 547(c)(4), a trustee may not avoid a transfer to the extent that, after such transfer, the creditor gave new value to or for the benefit of the debtor that was not secured by an otherwise unavoidable security interest and on account of which new value the debtor did not make an otherwise unavoidable transfer.

**"New value" includes "money or money's worth in goods, services, or new credit."** 11 U.S.C. § 547(a)(2). **Courts have recognized that services constitute new value when they confer actual economic benefit on the debtor or the estate.** See In re Jet Florida System, Inc., 861 F.2d 1555, 1558–59 (11th Cir. 1988); *In re Prescott*, 805 F.2d 719, 731 (7th Cir. 1986).

After the Transfer, Defendants provided services to the Debtor at his specific request, including the immediate removal of negative social media posts and reputational mitigation. At the time these services were provided, they had clear economic value to the Debtor because they were intended to help him maintain his business reputation and continue obtaining financing and investor participation.

At the time of the Transfer, Defendants had no knowledge that the Debtor was operating a fraudulent investment scheme. Defendants only discovered the fraudulent nature of the Debtor's activities after the Transfer. Once they made these discoveries, **Defendants took substantial, uncompensated action that directly benefited the bankruptcy estate, including organizing victims, gathering claim information, coordinating with counsel, and assisting regulators.**

**While § 547 does not contain an express "good faith" defense, courts retain equitable authority under § 105(a) to limit avoidance when recovery would be fundamentally inequitable.** Defendants provided value in good faith, without knowledge of the Debtor's insolvency or fraudulent scheme, and later acted as whistleblowers who helped expose the fraud and organize other creditors. Allowing the Trustee to recover the full amount from these victims — after their funds were used to pay prior creditors and after they assisted the estate — would permit the very type of inequitable result the preference laws and equitable principles were designed to prevent. See Mann v. LSQ Funding Grp., L.C., 71 F.4th 640 (7th Cir. 2023); Matter of Taxman Clothing Co., 49 F.3d 310 (7th Cir. 1995).

**The services Defendants provided immediately after the Transfer had measurable economic value to the estate when rendered.** The monetary value of those services at the time of the Transfer is a question for the factfinder. Based on Defendants' three-month and twelve-month retrospective analysis of the Debtor's investor income, the savings to the estate were likely in the hundreds of thousands of dollars. These services were unsecured, and the Debtor did not make an otherwise unavoidable transfer on account of them. Defendants therefore contend that they constitute subsequent new value under § 547(c)(4). [Exh. UU Analysis of Likely Benefit of Defendants Services to the Benefit of the Estate at 3 and 12 months]

Defendants further provided subsequent new value of benefit to the estate in the form of uncompensated services that protected the assets and prevented dilution of the investor pool. The evaluation of these services is a determination for the jury.

Plaintiff's theory improperly asks the Court to assess "reasonably equivalent value" based on what occurred after the Transfer—that is, with hindsight. Courts evaluating "value," or "reasonably equivalent value" where applicable, assess it objectively at the time of the transaction rather than

15

through the "wisdom hindsight often brings." *Janvey v. The Golf Channel, Inc.*, No. 15-0489, slip op. (Tex. Apr. 1, 2016) (rejecting hindsight as the measure of the exchange's fairness or value).

Likewise**, the Seventh Circuit has cautioned against "hindsight bias" when assessing whether a transaction was objectively adequate at the relevant time.** In *Boyer v. Crown Stock Distribution, Inc.*, the court warned that "unreasonably small" valuation judgments are "in danger of being interpreted under the influence of hindsight bias"—that is, by evaluating the transaction's outcome rather than the objective value of what was exchanged when it was exchanged. 587 F.3d 787 (7th Cir. 2009).

The value at issue must be evaluated as of December 11–13, 2023, when the contemporaneous exchange occurred. Plaintiff's attempt to minimize the exchange does not eliminate the factual dispute concerning what value the Debtor received. The impact on the Debtor's ability to reassure creditors, slow accelerated loan demands, continue investor solicitations, and maintain financing remains disputed.

Here, the consideration was payment for services designed to mitigate reputational harm—services provided, or scheduled and performed, to address known business risks when the Debtor sought performance. The factfinder should assess whether those services had objective market or business value to the Debtor at the time of the exchange, such as the value of reputational remediation, crisis management, communications strategy, influencer or press outreach, or analogous mitigation work. The inquiry is not whether the Debtor later suffered additional downturns, adverse publicity, or business losses despite paying for mitigation.

To the extent Plaintiff argues that because the results were not perfect, or because the debtor ultimately did not avoid all harms, the exchange must have lacked value, Plaintiff is effectively asking the Court to apply outcome-based reasoning prohibited by Janvey and cautioned against by Boyer. That approach conflates (1) the objective adequacy of consideration when services were purchased and performed with (2) whether external events and business dynamics ultimately produced a favorable outcome.

The contemporaneous value provided to the Debtor was not limited to the mechanical act of editing or removing a social-media post. The services were requested and performed during what the Debtor himself described as an immediate financial crisis involving lender reaction, threatened nonpayment, spreading public exposure, and a developing "run on the bank".

The Debtor's operations depended substantially upon the continuing willingness of private lenders and investors to leave funds outstanding, renew or roll over existing obligations, refrain from demanding immediate repayment, and provide additional financing. Public dissemination of Defendants' documented experience threatened that funding structure in two related ways: existing lenders could demand repayment or decline further extensions, and prospective lenders could withhold new funds.

The requested mitigation services—including publication of a paid-in-full update, removal or mitigation of identified posts, cessation of further dissemination, and implementation of a public-facing resolution—therefore had direct economic significance to the Debtor at the time of the Transfer. Their intended and immediate purpose was to slow or stop additional lender reaction, reduce demands for repayment, preserve existing financing, and protect the Debtor's ability to obtain the continued liquidity upon which his operations depended.

16

The threatened lender reaction provides objective evidence that the services were economically valuable and that their value cannot reasonably be declared zero as a matter of law. Debtor's own contemporaneous statements, his rapid escalation from inability to make even a partial payment to wiring $56,638.91, and his repeated demands for immediate public-facing relief support a finding that he attributed substantial monetary value to stopping the developing lender response.

That the involuntary bankruptcy petition was filed six days later does not establish that the services lacked value when rendered. The relevant inquiry is the value of the services at the time of the exchange, not whether those services ultimately succeeded in preventing a later bankruptcy. The later filing may affect the amount ultimately assigned to the services, but it does not permit Plaintiff to establish, as a matter of law, that immediate mitigation of a developing lender run had no monetary value.

The precise amount of lender funding protected or repayment demands delayed cannot presently be determined because Plaintiff has not produced complete communications between the Debtor and his lenders, and the Debtor has not yet been examined concerning the "run on the bank" he described. Those records and testimony are uniquely relevant to valuation. They would identify the lenders who reacted, the amounts involved, the demands made, and whether those demands were slowed or temporarily withdrawn after the public-facing resolution. The absence of that discovery does not establish zero value; it supports denial or deferral of summary judgment under Rule 56(d).

**E. Economic Realities and Equitable Considerations Weigh Against Summary Judgment for the Full Amount**

**In response to Defendants' Interrogatory No. 13, Plaintiff admitted that the anticipated costs of litigating this matter exceed the amount sought to be recovered. Continuing this litigation will consume additional estate resources with little or no net benefit to creditors and quite possibly cause a net deficit.**

**Any judgment obtained against Defendants who are elderly Florida residents with only fully exempt assets under Florida law would have limited collectible value. Judgments of this nature are routinely sold to third-party debt buyers for a small fraction of face value.**

Moreover, Defendants have received communications from multiple lead petitioners and other creditors expressing their desire for a prompt and reasonable resolution rather than prolonged litigation with uncertain and potentially negative net recovery. These creditors support the Court evaluating the economic realities of continued litigation against Defendants, including the substantial uncompensated services Defendants have already provided to the estate.

Even if some preference liability were found to exist, Plaintiff's characterization of Defendants as having "refused to return the Transfer despite written demand" is not an equitable claim. Defendants provided financial and exemption information and made good-faith settlement offers through counsel in January 2026 and again in February 2026. A standing settlement offer remains despite Defendants' awareness of their non-recoverability in hopes of ending the costs of this proceeding and allowing for the disbursement of funds to the creditors.

Furthermore, Defendants acted in good faith both before and after the Transfer. At the time of the Transfer, Defendants had concerns about the Debtor's business practices but lacked knowledge or evidence of the true nature of the investment program. They learned of those issues only afterward, through their own investigation and communications with other investors. Once they discovered the

real estate portion of Debtor's "investments", Defendants immediately took substantial, uncompensated steps to warn others, assist fellow victims, and help preserve the estate.

Defendants contend that their status as elderly victims, Florida homestead and exemption protections, and substantial uncompensated services to the estate render any disallowance under § 502(d) inequitable and unwarranted. They further contend that § 105(a) permits the Court to exercise equitable authority consistent with the Bankruptcy Code where appropriate.

Plaintiff's discovery responses establish that the maximum amount sought from Defendants is $56,638.91 and that the anticipated cost of litigating the claim through recovery exceeds that amount. Defendants provided Plaintiff with financial and exemption information supporting their contention that any judgment would be difficult to collect, but Plaintiff has not accepted that contention. These circumstances do not independently determine whether the Transfer satisfies 11 U.S.C. § 547, and Defendants do not offer litigation expense as a substitute for their statutory defenses. They do, however, bear directly on whether continued expenditure of estate resources is reasonably calculated to produce a net benefit for creditors.

A Chapter 7 trustee must "collect and reduce to money the property of the estate" and close the estate "as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). In *Matter of Taxman Clothing Co.*, 49 F.3d 310 (7th Cir. 1995), the Seventh Circuit addressed the continued prosecution of a preference action where the anticipated and ultimately incurred litigation expenses exceeded the amount reasonably recoverable for creditors. The court explained that the fiduciary obligation of a trustee and estate counsel is to maximize the estate's net assets, not merely to pursue a nominal gross recovery without regard to the expense and probability of collection. Id. at 314–15.

Taxman further recognized that the required care, diligence, and judgment extend not only to the manner in which estate claims are litigated, but also to deciding "which claims to prosecute, and how far." Id. at 315. The relevant inquiry is prospective and objective: whether the probable recovery, discounted by litigation risk, remaining expense, delay, and collectability, is reasonably commensurate with the resources required to obtain it. Id.

The present action involves substantial factual disputes concerning the source and ownership of the transferred funds, the nature and allocation of the payment, the contemporaneous exchange negotiated by the parties, the value supplied by Defendants, the Debtor's credibility, and the extent to which the Transfer diminished the estate. Resolution will require additional discovery, deposition testimony, evidentiary determinations, and, if summary judgment is denied, trial. Plaintiff nevertheless admits that the anticipated expense of pursuing recovery likely exceeds the maximum amount demanded from Defendants.

**Defendants do not contend that Taxman creates an additional statutory exception to avoidance under § 547(c), nor do they ask the Court to decide a collateral claim concerning professional compensation in this adversary proceeding. Taxman is relevant because it confirms that the economic purpose of avoidance litigation is the production of a meaningful net benefit for the bankruptcy estate and its creditors—not the entry of a judgment whose litigation and collection costs consume or exceed its expected value.**

**Plaintiff's admission places this proceeding squarely within the fiduciary concern identified by the Seventh Circuit in *Matter of Taxman Clothing Co.*, 49 F.3d 310 (7th Cir. 1995). Taxman**

18

**arose from preference litigation and held that the duty to preserve estate value requires care and judgment not only in litigating claims, but also in deciding "which claims to prosecute, and how far." Id. at 315. Once it becomes reasonably apparent that the probable recovery will not justify the additional expense necessary to obtain it, continued prosecution is inconsistent with the obligation to conserve the estate's net assets. Id. at 315–16.**

Defendants recognize that Taxman concerned professional compensation and does not create a separate statutory defense under § 547(c). Its controlling Seventh Circuit reasoning is nevertheless directly relevant to the economic purpose and prudent administration of preference litigation. As the court emphasized, "bankruptcy is not intended to be a feast for lawyers." Id. at 316. Plaintiff's admitted cost-to-recovery imbalance therefore weighs strongly against expanding disputed inferences in Plaintiff's favor, resolving credibility questions on summary judgment, or committing additional estate resources without first requiring strict proof of every element of § 547(b) and fair consideration of Defendants' evidence and statutory defenses.

Accordingly, the admitted economic realities reinforce the need to evaluate Plaintiff's Motion strictly against Plaintiff's burden of proving every element of § 547(b), without resolving disputed facts, drawing adverse credibility conclusions against Defendants, or disregarding evidence supporting Defendants' statutory defenses. They also weigh strongly in favor of allowing the limited discovery necessary to test Plaintiff's factual assertions before additional estate resources are committed to a proceeding that Plaintiff acknowledges may not produce a net recovery.

## F. Rule 56(d) Relief Is Appropriate

Pursuant to Fed. R. Civ. P. 56(d), made applicable by Fed. R. Bankr. P. 7056, Defendants respectfully request that the Court deny or defer Plaintiff's Motion for Summary Judgment until Defendants have had a fair opportunity to complete discovery under the schedule already set by the Court.

Critical discovery remains outstanding and is essential to Defendants' opposition. Defendants need additional discovery concerning the Debtor's testimony, the complete Debtor–Delisle communications, metadata and timing of the produced text messages, any initial telephone contact between the Debtor and attorney Delisle, the purpose and source of the deposits used to fund the Transfer, the role of the depositors, and the factual basis for Plaintiff's characterization of the Transfer as solely an antecedent-debt payment with no new value. This discovery is directly material to Plaintiff's § 547(b) burden and Defendants' defenses concerning contemporaneous exchange for new value, value at the time of the Transfer, allocation, source of funds, dominion/control, diminution of the estate, and Debtor credibility.

Defendants have diligently pursued the transcript of the Debtor's approximately eight-hour Rule 2004 examination conducted by Department of Justice attorneys—the most detailed sworn testimony the Debtor has given. Plaintiff and her counsel were present at that examination. At the hearing on Defendants' Motion to Compel production of the transcript, Plaintiff's counsel represented that the examination contained no relevant information concerning the Transfer. Nevertheless, the Debtor later confirmed in a September 16, 2025 email to Plaintiff's counsel that "this particular payment to them [the Siewerts] was reviewed by Damaris Rosich-Schwartz in the 2004 Examination." Plaintiff and her counsel attended the examination, while Defendants did not and still lack access to the testimony. The fact that Plaintiff's Motion relies heavily on the Debtor's later affidavit—while his most comprehensive sworn examination concerning the same subject matter remains unavailable to

19

Defendants despite their efforts—further demonstrates why summary judgment is premature and why Rule 56(d) relief is warranted.

Defendants have acted diligently, but discovery remains ongoing. The Court's discovery schedule allows discovery through December 11, 2026. Defendants are pro se, reside in Florida, and are litigating against a Trustee and counsel located in Indiana. The long-distance nature of the litigation, the need to coordinate witnesses in multiple states, and the practical difficulty of obtaining non-party evidence have materially affected Defendants' ability to complete discovery before responding to Plaintiff's early summary-judgment motion.

Because Plaintiff's Motion relies heavily on the Debtor's affidavit and current characterization of disputed events, Defendants should be allowed time to complete discovery, as already scheduled by the Court, concerning the communications, bank records, and source-of-funds issues bearing directly on the disputed facts, and then to obtain relevant witness declarations.

Defendants are pursuing remote issuance of subpoenas following the Court's ruling permitting that process and are navigating the overlapping requirements of the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the applicable local rules. Defendants have diligently attempted to comply with the governing schedules and procedures despite the identified hardship circumstances. They also seek to conclude the matter promptly while ensuring that their rights and defenses may be fully presented.

Allowing the discovery period already set by the Court to proceed is fair and reasonable under the circumstances. Defendants therefore request that the Court deny Plaintiff's Motion for Summary Judgment or, at minimum, defer ruling under Rule 56(d) until Defendants can obtain and present the additional discovery essential to their opposition.

## IV. RESERVATION OF RIGHTS

Defendants respectfully reserve the right to supplement this Opposition, their Statement of Material Facts in Dispute, and any supporting declarations or exhibits with additional evidence and arguments, to the extent permitted by the Court and applicable rules. This reservation is made in light of ongoing discovery issues, including Defendants' efforts to obtain the Rule 2004 examination transcript, exhibits, recordings, and related materials through the subpoena and Touhy process identified by the Court. Defendants anticipate that further discovery may yield additional facts supporting their new-value defense under 11 U.S.C. § 547(c)(4), estoppel, and other preserved defenses, as well as additional evidence concerning the uncompensated services provided to the Debtor and creditors. Defendants further reserve all rights and defenses not expressly waived herein.

## V. CONCLUSION

Plaintiff has not shown that there is no genuine dispute of material fact or that she is entitled to judgment as a matter of law. The record contains genuine disputes regarding the nature, purpose, consideration, value, allocation, source of funds, diminution of the estate, Debtor credibility, estate benefit, practical recoverability, and Defendants' statutory and equitable defenses. Plaintiff's Motion for Summary Judgment should be denied.

In the alternative, the Court should deny or defer consideration of Plaintiff's Motion under Fed. R. Civ. P. 56(d) and permit Defendants to complete the necessary discovery within the period established by the Court's scheduling order.

WHEREFORE, Defendants respectfully request that the Court deny Plaintiff's Motion for Summary Judgment in its entirety, or alternatively deny or defer the Motion under Rule 56(d), permit necessary discovery, and grant any and all other relief the Court deems just and proper.

Respectfully submitted,

**Scott Siewert**

580 Bermudez Ct.
The Villages, FL 32162
828-550-6390 | scottsiewert@yahoo.com

**Teresa Siewert**

580 Bermudez Ct.
The Villages, FL 32162
407-484-9576 | tsiewert@yahoo.com

21

**CERTIFICATE OF SERVICE**

We hereby certify that on ___July 16___, 2026, a true and correct copy of the foregoing Defendants' Opposition to Plaintiff's Motion for Summary Judgment was served by U.S. Mail, first-class postage prepaid, and by email upon:

Joseph Mulvey, Esq.
133 W. Market St., #274
Indianapolis, IN 46204
317-721-1339
joseph@mulveylawllc.com

**Scott Siewert**                                          **Teresa Siewert**